# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| VERNON DEWAYNE WALTON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:20-cv-02845-JTF-atc |
| | ) | |
| TAYLOR KAPUSTA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER MODIFYING THE DOCKET, DENYING PETITION PURSUANT TO 28 U.S.C. § 2254, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Before the Court are the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition"), filed by Petitioner, Vernon Dewayne Walton, Tennessee Department of Correction ("TDOC") prisoner number 573774, who is currently incarcerated at the Mark Luttrell Transition Center ("MLTC") in Memphis, Tennessee (ECF No. 8); and the Answer to Petition for Writ of Habeas Corpus ("Answer"), filed by Grady Perry, the warden of the facility where Walton was previously confined (ECF No. 10).[1]  For the reasons stated below, the Court **DENIES** the § 2254 Petition.

---

[1]  The Clerk is directed to modify the docket to reflect Walton's current address, which was obtained from the TDOC's Felony Offender Information, *see* https://apps.tn.gov/foil-app/results.jsp (searched Mar. 19, 2023), and to mail a copy of this order and the judgment to him at that address.   The Clerk is further directed to substitute MLTC Warden Taylor Kapusta for Perry as respondent. *See* Fed. R. Civ. P. 25(d).

I.      **BACKGROUND**

A.      **State Court Procedural History**

On March 6, 2014, a grand jury in Shelby County, Tennessee returned a six-count indictment against Walton.  (ECF No. 9-1 at PageID 12-17.)  Count 1 charged Walton with the attempted first degree murder of Monique Smith, resulting in serious bodily injury.[2]  Count 3 charged Walton with employing a firearm during the attempted murder.  Count 4 charged Walton with an aggravated assault on Smith using a deadly weapon that resulted in bodily injury.  Count 5 charged Walton with an aggravated assault on Marvin Stepter by using or displaying a deadly weapon.  Count 6 charged Walton with recklessly, by use of a deadly weapon, engaging in conduct which placed persons in imminent danger of death or serious bodily injury.

On December 5, 2016, Walton pled guilty to Count 1 of the indictment in exchange for a negotiated sentence of imprisonment of sixteen (16) years to be served at 85% release eligibility.  (*Id.* at PageID 18-19.)  At the guilty plea hearing, Walton testified that he understood the plea agreement and was entering into it freely and voluntarily.  (ECF No. 9-3 at PageID 241-44.)  Nobody was threatening him or forcing him to plead guilty.  (*Id.* at PageID 244.)  Walton thoroughly discussed the matter with his attorney and his family.  (*Id.* at PageID 244-45.)  He made the decision to plead guilty.  (*Id.* at PageID 245.)  Walton testified that he was taking his medication as prescribed.  (*Id.* at PageID 245-46.)  He was clear of mind and understood the proceedings.  (*Id.* at PageID 246.)  In response to the court's asking Walton if he had any questions, the following exchange occurred:

---

[2] The record does not contain Count 2, which was another attempted first degree murder charge, this one involving premeditation.  (ECF No. 9-3 at PageID 243.)

2

> Q.     Is there anything that you're confused about or have any questions about?
>
> A.     Mr. Gilchrist was saying something about a post-conviction, I don't know what that is.
>
> Q.     Well, you'll learn soon enough.   Under our law after I sentence you and the judgment becomes final in this case, which means after I sentence you, you have a year if there were constitutional problems with this case, you know, some sort of whether the plea was done inappropriate or a new law comes out and changes something or whether you have a complaint about the representation of one of your lawyers or something like that, there is a procedure that allows you to file a petition asking me to hear that.
>
>        Now that's you know, one of those things of—that's why I'm asking you right now if there's any problems or anything you can think of because now is the time for us to talk about it.   But you would have a right, you know like I said, the law exists that allows you to address certain constitutional issues up to a year after this case.
>
> A.     Okay.
>
> Q.     All right.   And did you have any other questions about anything?
>
> A.     No, sir.

(*Id.* at PageID 246-47.)   Walton testified that he told his attorney everything he knew about the case.   (*Id.* at PageID 247.)   Gilchrist did everything Walton asked him to do within reason.   (*Id.*)   Judgment was entered on December 5, 2016.   (ECF No. 9-1 at PageID 20.)   Walton did not take a direct appeal.

On or about December 2, 2017, Walton filed a Petition for Postconviction Relief Pursuant to T.C.A. Section 40-30-101 *et seq.* in the Shelby County Criminal Court.   (*Id.* at PageID 21-28.)   Counsel was appointed to represent Walton.   (*Id.* at PageID 29.)   The State responded on January 30, 2018.   (*Id.* at PageID 31.)   An Amended Petition for Post-Conviction Relief was filed on August 8, 2018.   (*Id.* at PageID 40-51.)   A hearing on the post-conviction petition was held on

3

November 15, 2018.   (*Id.* at PageID 52; ECF No. 9-2.)   The post-conviction court denied relief

on February 1, 2019.   (ECF No. 9-1 at PageID 53-56.)   The Tennessee Court of Criminal Appeals

("TCCA") affirmed.   *Walton v. State*, No. W2019-00379-CCA-R3-PC, 2020 WL 864161 (Tenn.

Crim. App. Feb. 19, 2020), *appeal denied* (Tenn. July 21, 2020) (ECF No. 9-9.)

> The factual basis for the charges was as follows:
>
> > Had this matter gone to trial the State would have put on proof that on September the 19th, 2013, Mr. Walton armed himself with a handgun.   He followed Monique Smith for roughly two miles.   Ms. Smith, after realizing Mr. Walton was following her, he did try to run her off the road, she sought help at the Halle Football Stadium where she encountered an armed security guard.   She notified the security guard that Mr. Walton was following her and that she was scared.   At which point Mr. Walton pulls in, gets out of the car armed with a handgun, approaches Ms. Smith's car, shoots her in the face, in the body approximately nine times.
> >
> > After shooting her he fled.   He pointed a handgun at the security guard, Marvin Stepter, and was ultimately taken into custody by deputy Cruz (spelled phonetically), the Shelby County Sheriff's Department.   These events did occur. And Ms. Smith suffered—
> >
> > THE COURT:        Serious bodily injury.
> >
> > MS. FOWLER:        She did from the gunshot wounds.   She spent roughly a month in the Med.   She still has two casings or projectiles in her body. She's still undergoing medical treatment for the gunshots.
> >
> > These events did occur in Memphis, Shelby County. . . .

(ECF No. 9-3 at PageID 239-40.)   Walton's attorney, Charles Gilchrist, stipulated to those facts.

(*Id.* at PageID 241.)

## B.   Walton's § 2254 Petition

On November 19, 2020, Walton filed his *pro se* § 2254 Petition, accompanied by a legal

memorandum, in the United States District Court for the Middle District of Tennessee.   (ECF No.

1.)   That day, United States District Judge William L. Campbell, Jr. issued an order transferring

the § 2254 Petition to this district, where the convicting court is located.  (ECF No. 5.)   The matter was received in this court on November 19, 2020.   (ECF No. 6.)

In his § 2254 Petition, Walton argues that (1) his attorney rendered ineffective assistance by failing to seek a mental evaluation prior to the guilty plea (ECF No. 1 at PageID 17-20) and (2) his guilty plea was not voluntary, knowing, and intelligent (*id.* at PageID 20-22).   The Court entered an order on November 23, 2020 directing Warden Perry to file the state-court record and a response.   (ECF No. 8.)   Perry filed the state-court record on December 10, 2020 and his Answer on December 14, 2020.   (ECF Nos. 9, 10.)   Walton did not file a Reply.

## II.      ANALYSIS OF PETITIONER'S CLAIMS

### A.      Ineffective Assistance of Counsel (Claim 1)

In Claim 1, Walton argues that his trial counsel rendered ineffective assistance by failing to seek an evaluation by a forensic psychologist to determine his state of mind at the time of the crime and whether he was capable of entering a knowing, intelligent, and voluntary guilty plea. (ECF No. 1 at PageID 17, 18.)   Walton had previously been diagnosed with post-traumatic stress disorder ("PTSD") and with antisocial personality disorder, bipolar disorder with schizophrenic type one, anxiety disorder, major depressive disorder, and insomnia.  (*Id.* at PageID 18.)   He alleges that but for counsel's coercive actions, Walton would not have pled guilty.  (*Id.* at PageID 19.)

Walton's claim that his attorney rendered ineffective assistance is controlled by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   Those standards require a showing that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense."  *Id.* at 687.   To establish deficient performance, a person challenging a

conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Where, as here, a prisoner claims that his guilty plea arose from the ineffective assistance of counsel, "the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (internal quotation marks omitted).

> A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."

*Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks and citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the guilty plea context, a movant satisfies the "prejudice" requirement by "show[ing] that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Where "the [prisoner's] decision about going to trial turns on his prospects of success," he must also show that "he would have been better off going to trial" than pleading guilty. *Lee v. United States*, 137 S. Ct. 1958, 1965 (2017); *see also id.* at 1966 ("A defendant without any viable defense will be highly likely to lose at trial. And a defendant facing such odds will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial."); *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) ("[T]o obtain relief on this type of claim, a [prisoner] must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.").

6

Walton raised Claim 1 in a post-conviction petition.   (ECF No. 9-1 at PageID 24-26.)   At the post-conviction hearing, Charles Gilchrist, Walton's trial counsel, testified that he was appointed to represent Walton two and one-half years after he was indicted.  (ECF No. 9-2 at PageID 69.)   At the time, Gilchrist had been practicing law for eighteen (18) or nineteen (19) years.  (*Id.* at PageID 83.)   Walton had previously been represented by Paul Springer.  (*Id.* at PageID 69, 83.)   Gilchrist was never able to reach Springer despite making multiple attempts.  (*Id.*)   Gilchrist visited Walton between twelve (12) and twenty (20) times.   (*Id.* at PageID 89.)   Gilchrist testified that he "had a general overview [of the case] by looking at the file and discovery."  (*Id.* at PageID 70.)

Gilchrist discovered that a mental evaluation had previously been performed.   (*Id.*)   Gilchrist reviewed the letters that concluded that Walton did not qualify for a diminished capacity defense.  (*Id.* at PageID 73, 84.)   Because Walton's family emphasized the possibility of PTSD, Gilchrist "contacted at least two doctors to get their fees, get their quotes as far as what they would charge."  (*Id.* at PageID 73.)   He discovered that both would charge approximately $2500 at $200 an hour and a $2500 down payment "just to get things started."  (*Id.*; *see also id.* at PageID 87 ("Range would be $2,500 to five grand.").)   Gilchrist passed the information on to Walton's parents, who did not follow up, Gilchrist assumed for financial reasons.  (*Id.* at PageID 73.)   He discussed with the doctors whether they might give a discount, but the "issue sort of went away, and then bam bam trial was upon us, bam bam, got a new offer, he accepted the offer, case was over."  (*Id.* at PageID 87.)

Gilchrist testified that "once I took over the case and once I realized that he's already been evaluated from a mental health stand point, my focus was on a guilt innocence phase and that's

why I primarily hired or tried to get an investigator involved was from a guilt, innocence face [sic] slash any way to possibly work out a better deal." (*Id.* at PageID 71.) Gilchrist recalled that Walton's "exposure was great. I think his exposure was 30 to 80 years." (*Id.*) Gilchrist opined that "it was a slam dunk case as far as guilt or innocence." (*Id.*; *see also id.* at PageID 85 ("I thought it was a no brainer. I thought that he would also get 30 plus years.").) Gilchrist's goal was to get the best possible offer from the State. (*Id.* at PageID 71.) He felt that Walton's family "was misled a little bit on the mental health issues" so "they really had too much of a faith slash belief that a mental health defense was going to save the day for Mr. Walton when, in fact, after he'd been found competent, that wasn't going to be the case, in my opinion." (*Id.* at PageID 72.) Gilchrist's strategy was "to work out the best deal I could for him, plead guilty, and move on. Sometimes as cold blooded as that sounds, that's the reality of it." (*Id.*)

Gilchrist did not seek funds for an expert psychiatrist, and he did not know whether prior counsel had done so. (*Id.* at PageID 75.) At the time he represented Walton, Gilchrist was unaware of the contents of his Veterans Administration records. (*Id.*) Gilchrest testified that "I knew the family had limited means . . . but I did the best I could as far as contacting a couple doctors." (*Id.* at PageID 87.) In retrospect, however, Gilchrist wishes that he had sought funding. (*Id.* at PageID 87-88.) He believed, however, based on his discussions with various doctors, that "they didn't feel like that would negate the mental act itself or provide even a diminished capacity." (*Id.* at PageID 88; *see also id.* ("[T]he PTSD, they felt like it would more so fall into the category of anxiety disorders, bipolar, manic depressive behavior, things of that nature, not such to a level that would negate the required mental state.").) Gilchrist consulted with experts to determine whether there might be a viable diminished capacity defense or whether,

because of Walton's mental health issues, he was competent to stand trial.   (*Id.* at PageID 90.)

Ultimately, Gilchrst did not believe that retaining an expert would have made a difference.   (*Id.*

at PageID 89.)   In retrospect, testified Gilchrist, were he to "Monday morning, quarter back

myself," he might ask the judge for a private psychological evaluation.   (*Id.* at PageID 82.)

However, he continued, "the only thing I ever was told that would possibly help is his PTSD, but

every psychiatrist, psychologist, whatever professional I talked to said that that still would not

mitigate the fact that he—they felt like he was capable of forming the mental state to commit the

crime."   (*Id.*)

> At the close of the post-conviction hearing, the judge stated that

> Mr. Walton had privately retained counsel for over two years.   This Court
> authorized funds for a variety of evaluations and things at the request of Mr.
> Springer, who was his attorney at that time, and we talked a great deal about this.
> So, these issues that we're discussing here today are not brand new.   We've been
> talking about them ever since Mr. Walton has been in custody, which, according to
> the records here, is September of 2013. . . .

(*Id.* at PageID 104-05.)   The post-conviction court continued:

> And I have been told on multiple occasions that Mr. Walton was going to—
> especially during the time that he was represented by privately retained counsel,
> going to present varieties of medical proof, going to present varieties of medical
> proof, going to do a variety of things, and when it became clear that that was not
> the case, the Court authorized certain funds for independent analysis and evaluation
> of things of that nature. . . .

(*Id.* at PageID 105.)   As for the request for an expert in the post-conviction proceeding, the post-

conviction court opined:

> The rules simply do not provide—in fact, they actually proscribe me funding expert
> analysis or witnesses or anything for purposes of a post conviction.   So there is
> where we are. . . .   I'm going to take this under advisement for an extended period
> of time and if somehow you prevail upon someone to testify for free or Mr.
> Walton's family hires somebody or whatever, if there is, for whatever reason, some
> more proof to be put forward, I will allow that before I rule. . . .

(*Id.* at PageID 106.)   No further evidence was presented.   The post-conviction court denied relief. (ECF No. 9-1 at PageID 55.)   Walton raised the issue in his brief to the TCCA on the post-conviction appeal.   (ECF No. 9-4 at PageID 266-77.)   The TCCA denied relief.   *Walton*, 2020 WL 864161, at *6.

Where, as here, a state prisoner's claim has been adjudicated on the merits in state court, a federal court can issue a writ only if the adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

The deference to be accorded a state-court decision under *Strickland* is magnified when reviewing an ineffective assistance claim under 28 U.S.C. § 2254(d):

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.   The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)].   The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420.   Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.   "[S]trict adherence to the *Strickland* standard [is] all the more essential when reviewing the choices an attorney made at the plea bargain stage."   *Premo v. Moore*, 562 U.S. 115, 125 (2011).   "In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel.   [The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254,] compounds the imperative of judicial caution."   *Id.*

Walton cannot establish that his attorney's representation was contrary to *Strickland* or *Hill*.   A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).   The TCCA cited the correct legal rule from *Strickland* and from Tennessee cases applying *Strickland*.   *Walton*, 2020 WL 864161, at *5.   This is "a run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" and, therefore, it does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause."   *Williams*, 529 U.S. at 406.

Walton also has failed to demonstrate that the TCCA's decision was an unreasonable application of clearly established federal law.   An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."   *Id.* at 413.   The state court's application of federal law must be "objectively unreasonable" for the writ to issue.   *Id.* at 409.   It is not sufficient that the habeas court, in its independent judgment,

determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

Walton has not satisfied his burden of demonstrating that the TCCA's rejection of his claims was based on an objectively unreasonable application of *Strickland* and *Hill*. The TCCA noted that "[t]he record reflects that counsel determined, at the outset of his representation, that [Walton] had undergone at least one psychiatric evaluation, which did not support reliance on a mental health defense." *Walton*, 2020 WL 864161, at *6. The TCCA concluded:

> At the hearing, [Walton] did not offer expert psychiatric testimony to show that a mental health defense would have been a viable option at a trial or that his prescription medication usage on the day of the offense had any effect on his ability to form the mens rea for the crime. The record supports the post-conviction court's determination that [Walton] failed to establish deficient performance and prejudice relative [to] counsel's informed decision not to pursue a mental health defense. . . .

*Id.* (citation omitted). Walton makes no argument that the TCCA's decision was an unreasonable application of *Strickland*.

Finally, Walton has failed to demonstrate that the TCCA's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "[W]hen a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)). A state court factual determination is not "unreasonable"

merely because the federal habeas court would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."). Walton does not address the TCCA's decision and, therefore, he has not established that its factual findings are objectively unreasonable.

Claim 1 is without merit and is **DISMISSED**.

### A.     Involuntary Guilty Plea (Claim 2)

In Claim 2, Walton argues that his guilty plea was involuntary because he did not believe that he had a choice.   Walton also submits that he was suffering from severe mental illnesses at the time he entered the guilty plea and that the trial court failed to inquire into the effect these disorders had on Walton.   (ECF No. 1 at PageID 21-22.)

The standard for evaluating the voluntariness of a guilty plea is as follows:

> A defendant who pleads guilty waives a number of federal constitutional rights, including the right to a jury trial and the right to confront his accusers. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969).   Because of the importance of these rights, reviewing courts must ensure that the defendant's waiver was knowing and voluntary.   We therefore insist that the defendant appreciated the consequences of the waiver, did so without coercion, and understood the rights surrendered.   *Brady v. United States*, 397 U.S. 742, 748-50 (1970); *Fautenberry v. Mitchell*, 515 F.3d 614, 636-37 (6th Cir. 2008).   Specifically, guilty pleas "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748.   The Supreme Court defines a voluntary plea as one "entered by one fully aware of the direct consequences."   *Id.* at 755.

> While a defendant need not know all the possible consequences of his plea, like the loss of his right to vote or own a gun, or the effect on future sentence[s], he must be aware of the maximum sentence to which he is exposed.   *King v. Dutton*, 17 F.3d 151, 154 (6th Cir. 1994); *Hart v. Marion Corr. Inst.,* 927 F.2d 256, 259 (6th Cir. 1991).   And, "[a]t a minimum, the defendant must understand the

26.)'critical' or 'essential' elements of the offense to which he or she pleads guilty." *United States v. Valdez*, 362 F.3d 903, 909 (6th Cir. 2004) (citing *Bousley v. United States*, 523 U.S. 614, 618-19 (1998)).  The satisfaction of these requirements cannot be inferred from the bare fact that the defendant pleaded guilty, because he still might not have known what he was giving up when he did so**.**  *Boykin*, 395 U.S. at 243.

*Ruelas v. Wolfenbarger*, 580 F.3d 403, 408-09 (6th Cir. 2009) (parallel citations omitted).

Walton raised this issue in his post-conviction petition.  (ECF No. 9-1 at PageID 26.) Trial counsel testified that Walton accepted a plea offer four to six months after he was assigned to the case; he "was sort of amazed that it had been in somebody's hands for two and a half years." (ECF No. 9-2 at PageID 81.)   Trial counsel did not feel any pressure to reach a deal with the State, although since a mental defense was not viable, " [he] felt pressured to work out the best deal [he] could for him." (*Id.* at PageID 81-82.)   Gilchrist recalled that the "trial date . . . was coming up and [Walton] didn't need to go to trial, in [his] opinion."  (*Id.* at PageID 82.)

Gilchrist emphasized that the plea agreement was favorable.   Walton pled guilty to Count 1 of the indictment in exchange for a negotiated sentence of sixteen (16) years confinement to be served at 85% release eligibility.   In addition, the gun charge, which required service of 100% of the sentence, was dismissed.   Gilchrist believed that some of the other counts count would have been run consecutively.   Ultimately, Gilchrist "thought [he] saved Mr. Walton at least 16 years. I thought he was going to get probably 32 years, maybe more."  (*Id.* at PageID 85.)   Gilchrist explained that "this young lady was shot six times.   Whether or not he remembered it or whether or not he felt like he was mentally with it when he did . . . ."  (*Id.*)   "The victim was very lucky to have survived."  (*Id.* at PageID 86.)

Walton testified that Gilchrist visited him between four and eight times.  (*Id.* at PageID 98.)  He recalled that he had been diagnosed with PTSD in 2006, "[s]hortly after being in the

military." (*Id.* at PageID 92.)   Walton has also been diagnosed with "[a]ntisocial personality disorder, bipolar disorder with schizophrenic type one, anxiety disorder, major depression disorder, and . . . insomnia." (*Id.* at PageID 92-93.)   Those diagnoses were made in 2008, when Walton started going to the VA Medical Hospital for treatment. (*Id.* at PageID 93.)   Walton periodically saw a psychologist at the VA. (*Id.*)   He was prescribed Paxil and Citalopram, which are antidepressants. (*Id.* at PageID 94.)   Walton had also been prescribed Ambien, a sleep medication. (*Id.*)   For the most part, Walton took his medication as prescribed. (*Id.* at PageID 95.)   Walton complained that Gilchrist did not obtain his medical records from the VA. (*Id.* at PageID 98-99.)   Had Walton known about the side effects of the medicines he was taking, he would have gone to trial. (*Id.* at PageID 99.)   He regrets his guilty plea because he lost his right to appeal. (*Id.*)   He recalled the trial judge telling him that he would lose the right to appeal, but he "was dazed out," disbelieving that he was "finna do 16 years in the penitentiary." (*Id.*)

On the day of the incident, Walton had taken a shot or two of whiskey. (*Id.*)   He took his medication for depression and anxiety, including Paxil. (*Id.* at PageID 96.)   He also took Ambien at approximately 5:00 p.m. (*Id.*)   Previously, he had not slept "in probably about three or four days." (*Id.*)

Walton testified that Gilchrist advised him that if he did not plead guilty, he "was going to have to do, like, 50 something years.   He didn't say around 30, he said he was guaranteed that I was going to do 50 something years." (*Id.*)   Walton was skeptical because that was his first crime. (*Id.* at PageID 97.)   Walton pled guilty because he believed that "I didn't feel like I had no choice." (*Id.*)   He told the trial judge that the plea was voluntary "[b]ecause when your back against the wall—you either going to do 50 years over here or 16 over here.   Them your choices,

so your choice is going to be 16." (*Id.*)  Gilchrist advised Walton that he was not going to win were he to go to trial. (*Id.*)  Walton agreed that it was better to do sixteen years than something more. (*Id.* at PageID 100.)

The post-conviction court denied relief. (*Id.* at PageID 55.)  The issue was presented in Walton's brief to the TCCA on the post-conviction appeal. (ECF No. 9-4 at PageID 277-89.) The TCCA denied relief. *Walton*, 2020 WL 864161, at *6.

Walton has not established that the TCCA's decision was contrary to *Boykin, Wolfenbarger* or any other Supreme Court decision.  Again, this is a run-of-the-mill decision applying the correct legal rule from clearly established Federal law, as determined by the Supreme Court of the United States and Tennessee cases applying *Boykin* and *Wolfenbarger*.  Therefore, the "contrary to" clause is inapplicable.  See 28 U.S.C. § 2254(d)(1)-(2).

Walton also has not established that the TCCA's decision was an unreasonable application of any United States Supreme Court decision or was based on an objectively unreasonable factual finding.  The TCCA reviewed the transcript of the guilty plea hearing, including the facts that Walton was advised of his right, acknowledged that he was pleading guilty of his own accord and that he was not coerced into entering a plea, and testified that he understood the consequences of his plea and that he was taking his medication as prescribed. *Id.*  The TCCA also rejected Walton's argument that he had no choice but to plead guilty:

> At the post-conviction hearing, [Walton] said that he understood the guilty plea at the time he entered it but that he felt like he had no option but to plead guilty because trial counsel advised him he would face the possibility of a much longer sentence if he went to trial than if he accepted the sixteen-year plea offer.  The post-conviction court rejected [Walton's] claim that he had no choice and found, instead, that [Walton] knowingly chose to plead guilty in order to minimize the sentence he would have to serve.  The record supports the court's determination. [Walton] was faced with overwhelming evidence of his guilt of several charges,

16

> which carried the possibility of a significant prison sentence.   Counsel advised
> [Walton] of the likelihood of conviction and a lengthy sentence.   No mental health
> defense could be supported based upon the findings of the court-ordered psychiatric
> evaluation, and no funds were available for a defense psychiatric evaluation.
> [Walton] elected, given the circumstances in which he found himself, to plead
> guilty and receive a sixteen-year sentence for attempted first degree murder and
> dismissal of the additional charges.   [Walton] is not entitled to relief on this basis.

*Id.*   Walton has made no argument that the TCCA's decision was an unreasonable application of

*Boykin* or *Wolfenbarger,* or that it was based on an unreasonable factual finding.

Claim 2 is without merit and is **DISMISSED**.

\*   \*   \*   \*

Because every claim presented is without merit, the Court **DENIES** the § 2254 Petition.

The § 2254 Petition is **DISMISSED WITH PREJUDICE**. Judgment shall be entered for

Respondent.

## III.    APPEAL ISSUES

28 U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision

denying a § 2254 petition and to issue a certificate of appealability ("COA") "only if the applicant

has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2);

*see also* Fed. R. App. P. 22(b).   The COA must indicate the specific issue or issues that satisfy

the required showing.   28 U.S.C. §§ 2253(c)(2) & (3).   No § 2254 petitioner may appeal without

this certificate.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A "substantial showing" is made when the movant demonstrates that "reasonable jurists

could debate whether (or, for that matter, agree that) the petition should have been resolved in a

different manner or that the issues presented were adequate to deserve encouragement to proceed

further."   *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted).

> Where a district court has rejected a constitutional claim on the merits, the showing required to satisfy § 2253(c) is straightforward:   The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . .   When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . . .

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "In short, a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect."   *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020).   "To put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*."   *Id.*; *see also id.* ("Again, a certificate is improper if *any* outcome-determinative issue is not reasonably debatable.").

In this case, there can be no question that the § 2254 Petition is meritless for the reasons previously stated. Hence, the Court **DENIES** a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.   However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.   *See* Fed. R. App. P. 24(a) (4)-(5).   In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.   It is therefore **CERTIFIED**, pursuant to Federal Rule of

Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.   Leave

to appeal *in forma pauperis* is **DENIED**.[3]

       **IT IS SO ORDERED**, this 18th day of April, 2024.


                           ***s/John T. Fowlkes, Jr.***       
                           JOHN T. FOWLKES, JR.
                           United States District Judge

---

[3] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of   Appeals within 30 days of the date of entry of this order.   *See* Fed. R. App. P. 24(a)(5).